**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

IDOLTHUS HUBBARD

                    Petitioner,

v.                                                            Case Number: 07-CV-15392

THOMAS BELL,

                    Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS
AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY**

    Idolthus Hubbard ("Petitioner"), a state prisoner currently confined at the

Muskegon Correctional Facility in Muskegon, Michigan, has filed a pro se petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Following a joint trial, by separate

jury, with his co-defendant and brother Alton Hubbard in the Wayne County Circuit

Court in 2005, Petitioner was convicted of three counts of first-degree murder, Mich.

Comp. Laws § 750.316, and one count of possession of a firearm during the

commission of a felony, Mich. Comp. Laws § 750.227b.  He was sentenced to three

non-parolable life sentences for the murder convictions, plus two years in prison for the

felony firearm conviction.

    Petitioner now raises claims concerning his joint trial with a separate jury, the

exclusion of evidence used to impeach his co-defendant, the voluntariness of his

*Miranda* waiver and confession, the effectiveness of trial counsel, the sufficiency of

evidence, and the admission of a victim photograph.  For the reasons set forth herein,

the court denies the petition for a writ of habeas corpus and declines to issue a

certificate of appealability.

## I. BACKGROUND

The facts of the case have been fully set out by the Michigan Court of Appeals,

and are summarized as follows:

> On August 18, 2004, Annie Rivers, Jerome Edmonds, and Frank Olson
> were killed at 4139 Canton Street, a known drug house on Detroit's east
> side.  Edmonds and Rivers were found inside the house, each dead from
> various gunshot wounds.  Olson was found on the sidewalk in front of the
> house, near death with several gunshot wounds.  Olson had apparently
> been shot inside, but had made his way to the front yard before collapsing.
> Olson died from his wounds shortly after being transported from the
> scene.
>
> Alton and Idolthus were each charged with three counts of first-degree
> murder and various firearm-related offenses, and were bound over for joint
> trial.  Both codefendants timely moved for severance of their trials.  Both
> codefendants also filed pretrial motions for suppression of their statements
> to the police.  The trial court denied the motions for complete severance,
> but ordered the use of two separate juries.
>
> After being arrested, Idolthus gave two separate statements to the police -
> one between 9:00 and 9:30 p.m. on August 23, 2004, and the other at
> about 1:15 a.m. on August 24, 2004.  Alton gave one statement to the
> police following his arrest, at about 12:15 a.m. on August 24, 2004.  A
> Walker [*People v. Walker*, 132 N.W.2d 87 (Mich. 1965)] hearing was held
> with respect to both codefendants' custodial statements.  The trial court
> concluded that all three statements were voluntarily, knowingly, and
> intelligently given.  The court denied codefendants' motions to suppress.
>
> At trial, Alton's jury and Idolthus's jury were selected from two separate venires.
> Opening statements concerning Alton Hubbard were given before Alton's jury
> only. Opening statements concerning Idolthus Hubbard were given before
> Idolthus's jury only.
>
> Detroit Police Sergeant Ed Williams testified before Idolthus's jury
> concerning the details of Idolthus's statements to the police.  In the first
> statement, Idolthus blamed Alton for shooting Edmonds and Olson, but did

2

not account for the shooting of Rivers.  He stated that Alton had used both a .38-caliber revolver and a 12-gauge shotgun.  Idolthus admitted that he was at the scene and that he had possessed a .38-caliber revolver that was similar to the one possessed by Alton.  However, Idolthus stated that he killed no one and that he only "shot at the wall."  Idolthus stated that the homicides were robbery-related, and that Alton had wanted to rob the house at 4139 Canton Street in order to "get [the] bread."  Idolthus suggested that Alton had killed Edmonds and Olson because he did not want to "leave [any] witnesses."

Williams then testified concerning Idolthus's second statement to the police, and read the statement before Idolthus's jury.  In the second statement, Idolthus stated that he had not been completely truthful in his first statement.  Idolthus stated that although Alton had shot Edmonds and Olson, he had shot the "lady" in "the kitchen."  Idolthus's jury was then excused and Alton's jury was brought into the courtroom.  Detroit Police Sergeant Ernest Wilson testified regarding Alton's statement to the police, and read the statement before Alton's jury.  In the statement, Alton admitted that he had shot Edmonds and Olson, but stated that Idolthus had shot Rivers.  Alton also stated that Jones had been present at the scene, had possessed a gun, and had shot into a front bedroom.  However, Alton indicated that Jones had not killed anyone.

Trial then proceeded before both juries.  Several police witnesses testified that both codefendants had been advised of their constitutional rights, had voluntarily waived their rights, had indicated that they were willing to speak with the police, and had been treated fairly before giving each statement.

Genevia Pernell testified before both juries that she was a family friend of codefendants and that she knew their mother well.  Pernell testified that she could account for Alton's whereabouts for the entire afternoon and evening of August 18, 2004.

Alton then testified before both juries concerning his alibi defense.  He testified that he was never present at 4139 Canton Street on August 18, 2004.  Alton testified that during his interrogation, he and Williams got into a verbal altercation and that Williams "punched [him] in the chest," punched him "more than five" times, and attempted to choke him.  According to Alton, Wilson then wrote out a statement and forced him sign it.  Alton testified that he only signed and initialed the statement because he was afraid of being further physically abused, and that he told Wilson "whatever [Wilson] wanted to hear" because he "didn't want to be hit no more."  Alton claimed that he never told the police that he had shot anyone, that he had possessed a firearm, or that he had been present at 4139 Canton Street on August 18, 2004.  Alton testified that although he

3

signed the statement and had even written out a portion of it in his own handwriting, Wilson had simply fabricated the content of the document. Although Alton denied ever implicating himself in the homicides, he did admit that he had earlier told the police that "[Idolthus] probably did the murders."

Idolthus then testified before both juries that he had been selling crack at 4139 Canton Street on August 18, 2004. Idolthus testified that he had already left 4139 Canton Street for the day and was walking in the vicinity of Gratiot Avenue and East Grand Boulevard when Alton pulled up in a car and "told [him] to get in the car." According to Idolthus, Alton asked where he could get a gun. Idolthus testified that he had a 9 mm handgun in his possession at the time, but did not want to give it to Alton; therefore he told Alton that he could use a 12-guage [sic] shotgun that was kept in the upstairs bedroom at 4139 Canton Street.

Idolthus returned to 4139 Canton Street with Alton late in the afternoon of August 18, 2004. Alton and Idolthus entered the house and Idolthus went upstairs to get the 12-guage [sic]. Idolthus then returned downstairs and gave the shotgun to Alton. He testified that Alton took the shotgun, racked it, and walked toward the kitchen. Idolthus claimed that he remained in the living room and that he heard Alton shooting in the kitchen. He testified that he turned and saw Alton coming out of the kitchen with the shotgun and a .38-caliber revolver, and that Alton then shot Frank Olson in the dining room. Idolthus testified that he then ran from the house.

Idolthus maintained at trial that he did not shoot anyone and that Alton had killed all three victims. Idolthus testified that, although he possessed a 9 mm handgun at the time, he had never possessed a .38-caliber revolver and had never fired any shots at 4139 Canton Street. He also testified that he never discussed robbing the Canton Street house with Alton. The prosecution made clear that it believed the homicides were in some way related to a robbery or attempted robbery, but Idolthus retorted, "Why would I help rob my own dope house that I make money at?" Idolthus admitted that he signed and initialed both his first and second statements to police. But he claimed he was forced to sign the second statement only after Williams had wholly fabricated it in order to implicate him in the homicides.

Codefendants' sister testified that she could account for the whereabouts of Alton . . . for much of the afternoon and evening of August 18, 2004 . . .

Closing arguments regarding Alton Hubbard were given before Alton's jury only. Closing arguments regarding Idolthus Hubbard were given before Idolthus's jury only. Each jury was then instructed separately, outside the

4

presence of the other jury.  Neither Alton's counsel nor Idolthus's counsel objected to the jury instructions as read.

Idolthus's jury returned a verdict of guilty of three counts of first-degree premeditated murder, guilty of three counts of first-degree felony murder, and guilty of one count of felony-firearm.  Alton's jury returned a verdict of guilty of one count of first-degree premeditated murder, guilty of two counts of second-degree murder, guilty of one count of felony-firearm, and guilty of one count of felon-in-possession . . . The trial court noted that Idolthus had been convicted of three counts of first-degree premeditated murder and three counts of first-degree felony murder as "alternative theories," and vacated the felony murder convictions.

*People v. Hubbard*, No. 263127, 2007 WL 601603, *1-3 (Mich. Ct. App. Feb. 27, 2007).

Petitioner appealed as of right to the Michigan Court of Appeals, asserting the following claims:

I.      The trial court erred in denying the defense's request for a completely separate trial, where the dual jury procedure during a single trial was insufficient to protect [Petitioner's] constitutional rights of due process and the right to present a defense. Alternatively, the trial court erred in refusing to provide [Petitioner's] jury, pursuant to its request during deliberations, with evidence used to impeach his co-defendant, causing significant prejudice.

II.     The trial court's decision to deny [Petitioner's] pre-trial Motion to Suppress Incriminating Statements was erroneously made without regard for evidence that [Petitioner's] *Miranda* waiver was not knowing, intelligent or voluntary.

III.    [Petitioner] did not receive the effective assistance of counsel at trial.

IV.     [Petitioner] was convicted on insufficient evidence of first- degree murder.

V.      The trial court erred by overruling the defense's objection to People's Exhibit #30, depicting a victim's severely broken arm after a shotgun blast, which was introduced solely to support the highly prejudicial theory of torture by the [Petitioner] without any independent relevance to the proofs at trial.

5

The Michigan Court of Appeals affirmed the convictions. *Id.* at *23. The Michigan Supreme Court denied leave to appeal. *People v. Hubbard*, 737 N.W.2d 706 (Mich. 2007).

Petitioner thereafter filed the present petition for a writ of habeas corpus raising the same claims presented in the state courts. Respondent has filed an answer in opposition to the petition, contending that the claims lack merit and/or are barred by procedural default. Petitioner has filed a reply to that answer.

## II. ANALYSIS

## A. STANDARD OF REVIEW

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, govern this case because Petitioner filed his habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

 "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it

6

'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (emphasis in original); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in

7

assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Lastly, a state court's factual determinations are presumed correct on federal habeas review.  *See* 28 U.S.C. § 2254(e)(1).  A habeas petitioner may rebut this presumption with clear and convincing evidence.  *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

### B.  Joint Trial Claim

Petitioner asserts that he is entitled to habeas relief because the trial court erred in trying him with a separate jury, simultaneously with co-defendant Alton Hubbard, rather than providing him with a completely separate trial.  Petitioner first raised this issue prior to his trial.  The state trial court partially granted Petitioner's "Motion for Separate Trial" by ordering that separate juries hear the case, but maintained that the trials would be conducted simultaneously.  Petitioner argues that the defenses of the co-defendants were antagonistic and mutually exclusive, and the simultaneous presentation of the defenses improperly shifted the burden of proof at trial in violation of his constitutional rights.  Petitioner further argues that the prejudice of the joint trial was exacerbated by Alton Hubbard's testimony in front of Petitioner's jury, where Alton was cross-examined and impeached with his statement to police.  Petitioner asserts that since Alton's statement was not admitted into evidence, and the trial court denied Petitioner's jury's request for Alton's statement during deliberations, he was denied the opportunity to present a defense.  Petitioner argues that he should have been given a

8

separate trial or, in the alternative, that Alton's confession should have been admitted as substantive evidence and given to Petitioner's jury during deliberations.

Respondent contends that these claims lack merit and/or are barred by procedural default and do not warrant habeas relief.

### 1. Severance

The issue of severance is governed by state law. *See Hutchison v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002). The Sixth Circuit has ruled that a severance claim cannot provide a basis for habeas relief because the United States Supreme Court has never clearly established a federal right to severance. *See Phillips v. Million*, 374 F.3d 395, 398 (6th Cir. 2004). Petitioner has thus failed to state a claim upon which habeas relief may be granted as to this issue. Moreover, courts favor the joinder of defendants charged with participating in the same act or series of acts because it is more efficient than conducting separate trials. *See Zafiro v. United States*, 506 U.S. 534, 537 (1993).

Petitioner has not shown that being tried by separate juries in a joint trial with co-defendant Alton Hubbard compromised "a specific trial right" or prevented his jury from making a "reliable judgment about guilt or innocence." *Id.* at 539. While Petitioner and co-defendant Alton may have presented antagonistic defenses, they were not mutually exclusive. The dual jury, rendering independent verdicts, could have found both parties not guilty, both parties guilty, or one party guilty and one not guilty. Furthermore, since both Petitioner and co-defendant Alton waived their Fifth Amendment rights and testified at the joint trial, Alton was subject to cross-examination. There was therefore no possibility of a prejudicial *Bruton* error. *See Bruton v. United States*, 391 U.S. 123, 126 (1968) (the admission at a joint trial of a co-

9

defendant's confession to police which implicated the defendant violated the

Confrontation Clause where the co-defendant did not testify and could not be cross-

examined).  Thus, Petitioner was not denied his right to due process or any other trial

right by the use of a joint trial with separate juries.  Habeas relief is not warranted on

this claim.

### 2.  Co-Defendant's Police Statement

Petitioner's alternative claim regarding the dual trial is that Alton's police

statement, which was used to impeach Alton in front of both his and Petitioner's jury,

should have been admitted into evidence.  Petitioner argues that since Petitioner's

jury's request to obtain and bring a copy of Alton's statement into the jury room was

denied, that  he was denied the  opportunity to present a defense.  Respondent

contends that this claim is barred by procedural default due to Petitioner's failure to

object at trial.

This court will not determine whether this claim is barred by procedural default.

The Supreme Court has held that "federal courts are not required to address a

procedural-default issue before deciding against the petitioner on the merits."  *Hudson*

*v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518,

525 (1997)); *see also Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) (citing

*Lambrix* and *Hudson*); 28 U.S.C. § 2254(b)(2) (providing that a habeas application may

be denied on the merits despite the petitioner's failure to exhaust state court remedies).

"Judicial economy might counsel giving the [other] question priority, for example, if it

were easily resolvable against the habeas petitioner, whereas the procedural-bar issue

involved complicated issues of state law."  *Lambrix*, 520 U.S. at 525.  In this case, the

10

court finds that the interest of judicial economy is best served by addressing the merits of Petitioner's claim.

The Michigan Court of Appeals denied relief on this claim, noting that Alton's statement had never been admitted into evidence, and that "[i]t is error for the trial court to permit a jury, during deliberations, to take with it into the jury room any material that was not admitted into evidence." *Hubbard*, 2007 WL 601603 at *6 (citing *People v. Benberry*, 180 N.W.2d 391, 393 (Mich. Ct. App. 1970)). The court noted that "Idolthus's jury was . . . exposed to the existence of the statement and certain testimony concerning the statement[,]" but that "[b]ecause Alton's confession was never admitted into evidence before Idolthus's jury, the trial court correctly instructed Idolthus's jury that it could not have a copy of the statement." *Id.* at *7. However, the trial judge instructed that the jury "could 'use [their] collective memories to reconstruct the testimony about that statement that was given in front of [them].'" *Id.* (alterations in original).

The trial judge's decision not to allow the jury to have a copy of the non-admitted statement was a proper application of Michigan evidentiary law. Furthermore, Alton's statement corroborated Petitioner's second statement to police in which he admitted killing one of the victims, therefore inculpating Petitioner. The trial judge's refusal to allow the jury a copy of such inculpating information does not rise to the level of fundamental unfairness warranting federal habeas relief. *See Spalla v. Foltz*, 788 F.2d 400 (6th Cir. 1986) (the failure to satisfy jury's requests for transcript did not rise to level of being fundamentally unfair, where testimony was not key to petitioner's defense, nor was it exculpatory). In other words, even if the statement could have

11

been allowed into the jury room, its absence did not prejudice Petitioner because the statement did not exculpate him, but was in fact inculpatory of his direct role in at least one of the murders.  Habeas relief is not warranted on this claim.

### C.  *Miranda* and Involuntary Confession Claims

Petitioner next argues that the trial court erroneously denied his pre-trial motion to suppress the incriminating statement he made to police because his *Miranda* waiver and subsequent police statements were not made voluntarily, knowingly, or intelligently.  Petitioner argues that the nine hour duration of the detention (during which two interrogations were performed), the police's patently accusatory tone during the interrogations, his heightened level of confusion after being informed of his brother's statement, his youth (nineteen years of age), limited education and learning disability, and the fact that he was not given a chance to review his second incriminating statement, rendered his confession involuntary and inadmissable.

### 1. *Miranda* Waiver

Petitioner first asserts that he was not competent to waive his *Miranda* rights. He argues that his learning disability prevented him from making a knowing and intelligent waiver of his *Miranda* rights, and therefore, his waiver of those rights should be considered invalid.  The Michigan Court of Appeals denied relief on this claim, explaining:

> Idolthus next argues that his statements were not knowing and intelligent because he "did not possess the cognitive and intellectual skills required to fully and validly waive his constitutional rights."  To establish that a defendant's waiver of his Fifth Amendment rights was knowingly and intelligently made, " 'the state must present evidence sufficient to demonstrate that the accused understood that he did not have to speak,

12

that he had the right to the presence of counsel, and that the state could use what he said in a later trial against him.' " A defendant need not fully understand the ramifications and consequences of waiving his rights, and the test is not whether it was wise or smart for the defendant to admit his culpability. A defendant need only know of his available options and make a rational decision-not necessarily the best decision. Whether a waiver is knowing and intelligent depends on "the suspect's level of understanding, irrespective of police behavior."

Idolthus asserts, without more, that he was not able to knowingly and intelligently waive his Fifth Amendment rights because he was young, learning-disabled, and a below-average reader. However, Idolthus concedes that he is able to read and is not illiterate. In fact, he concedes that some of the evidence in this matter showed that "he actually had the ability to occasionally perform well in this area [of reading]."

The evidence adduced at the Walker hearing indicated that the police informed Idolthus of his Miranda rights before each of his statements, both aloud and by giving him a constitutional rights notification form. According to more than one witness, Idolthus appeared able to read, was able to communicate well, and was cooperative with the interviewing police officers. Also according to the witnesses, Idolthus indicated that he wished to waive his Fifth Amendment rights and speak with the police. He never asked for an attorney, and did not at any time state that he wanted to discontinue the interviews. Finally, the witnesses testified that Idolthus understood the questions asked by the police, did not appear to be injured or ill, and did not appear to be under the influence of drugs or alcohol. Idolthus, himself, admitted that he signed and initialed the two statements.

Idolthus also suggests that he was unable to knowingly and intelligently waive his Fifth Amendment rights in light of his age. However, we reject this argument. Idolthus was 19 years old at the time of his arrest – sufficiently mature to understand his rights.

While youth, learning disability, and emotional impairment must not be discounted in assessing whether a defendant's waiver was knowing and intelligent, these factors should not be "taken to elevate the obligations of the police to unreasonable levels." Although Idolthus may be learning disabled to some degree, and may have a somewhat-limited reading ability, there was no credible evidence introduced at the Walker hearing to indicate that he did not minimally understand the Miranda warnings as they were given. The trial court had a superior ability to assess the credibility of the witnesses, and properly weighed the relevant factors to determine that both of Idolthus's Fifth Amendment waivers were knowing

13

and intelligent.  The court did not clearly err in finding that Idolthus's
statements were knowingly and intelligently made.

*Hubbard*, 2007 WL 601603 at *11-12 (internal citations omitted).

This court agrees with the Michigan Court of Appeals.  In *Miranda v. Arizona*,
384 U.S. 436 (1966), the Supreme Court held that statements made during a custodial
interrogation of a suspect are inadmissible at trial unless the defendant has voluntarily
and knowingly waived certain rights prior to making those statements.  A defendant's
waiver of his *Miranda* rights must be found, based upon the totality of the
circumstances, to be voluntary, knowing, and intelligent.  *See Moran v. Burbine*, 475
U.S. 412, 421 (1986).  Courts have generally found that no single factor of an
accused's individual characteristics is dispositive when deciding whether a valid waiver
of rights was executed.  Whether a defendant understood his *Miranda* rights is a
question of fact underlying the determination of whether his waiver of those rights was
knowing and intelligent.  Thus, on federal habeas review, the state court's factual
finding that a defendant fully understood what was being said and asked of him is
presumed correct unless the petitioner shows otherwise by clear and convincing
evidence.  *See Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000); *Henderson v.
DeTella*, 97 F.3d 942, 946 (7th Cir. 1996).

Petitioner argues that his learning disability prevented him from validly waiving
his *Miranda* rights.  However, a knowing and intelligent relinquishment of *Miranda*
rights can be made by a defendant who has learning disabilities.  For example, in
*United States v. Male Juvenile*, 121 F.3d 34 (2d Cir. 1997), the court found that the
defendant, who had "a host of attentional and learning disabilities" was found to have

14

validly waived his *Miranda* rights because he had never exhibited anything "indicat[ing] that [he] could not comprehend the rights that were explained and read to him." *Id.* at 40. As the Supreme Court has stated, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Instead, the inquiry into a defendant's knowledge is whether a defendant is "so incompetent that he was not aware 'both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Male Juvenile*, 121 F.3d at 40 (quoting *Spring*, 479 U.S. at 573).

The case at hand is similar to *Male Juvenile* in that Petitioner did not exhibit any problems comprehending his *Miranda* rights. Detective Sergeant Drew testified that Petitioner admitted that he was able to read, and that Petitioner read out loud his rights on the form which he signed. *See* Walker Hrg. Tr. 17. Drew testified that Petitioner did so without difficulty, and that he did not have trouble with any of the words on the form. *Id.* at 17-18. The trial court found the officer's testimony credible, and concluded that Petitioner knowingly and voluntarily waived his rights and spoke to the police. The Michigan Court of Appeals also found that Petitioner was advised of his rights and read them out loud. *See Hubbard*, 2007 WL 601606 at *11. The state courts' credibility and factual determinations are presumed correct. *See, e.g., Miller*, 474 U.S. at 112. Petitioner has not offered evidence to overcome this presumption. Additionally, a Detroit Public Schools Individualized Education Program Team Report (Petr.'s Appx. F), lists "reading comprehension" as Petitioner's strengths. The record thus supports the state courts' determination that Petitioner was able to understand and comprehend

15

his *Miranda* rights and that he voluntarily waived those rights.  Because Petitioner did

not exhibit any problems understanding his rights at the time he waived them, the

Court agrees that his *Miranda* waiver was knowing, intelligent, and voluntary.  Habeas

relief is not warranted on this claim.

## 2.  Voluntariness of Confession

Petitioner asserts that his second police statement, in which he confessed to the

murder of Annie Rivers, was involuntary.  Petitioner claims that the police coerced him

into confessing by using an accusatory tone and that he was confused after his brother

inculpated him in Rivers's murder.  He further alleges that the length of his detention,

his learning disability, his youth, and his lack of education were contributing factors

which rendered his confession involuntary.

The Fifth Amendment privilege against compulsory self-incrimination bars the

admission of involuntary confessions.  *See Colorado v. Connelly*, 479 U.S. 157, 163-64

(1986).  A confession is considered involuntary if:  (1) the police extorted the

confession by means of coercive activity; (2) the coercion in question was sufficient to

overbear the will of the accused; and (3) the will of the accused was in fact overborne

"because of the coercive police activity in question."  *McCall v. Dutton*, 863 F.2d 454,

459 (6th Cir. 1988).  In determining whether a confession is voluntary, the ultimate

question is "whether, under the totality of the circumstances, the challenged confession

was obtained in a manner compatible with the requirements of the Constitution."  *Miller

v. Fenton*, 474 U.S. 104, 112 (1985).  The circumstances to be considered include:

> 1.    Police Coercion (a "crucial element")
> 2.    Length of Interrogation
> 3.    Location of Interrogation

16

    4.    Continuity of Interrogation
    5.    Suspect's Maturity
    6.    Suspect's  Education
    7.    Suspect's Physical Condition & Mental Health
    8.    Whether Suspect Was Advised of Miranda Rights

*Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).  All of the factors involved should

be closely scrutinized.  *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).  Without

coercive police activity, however, a confession should not be deemed involuntary.

*Connelly,* 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the

finding that a confession is not 'voluntary' within the meaning of the Due Process

Clause").  Coercion may be psychological, as well as physical.  *See Arizona v.*

*Fulminante*, 499 U.S. 279, 285-89 (1991); *Ledbetter v. Edwards*, 35 F.3d 1062, 1067

(6th Cir. 1994).  The burden of proving that a confession was involuntary rests with the

petitioner.  *Boles v. Foltz*, 816 F.2d 1132, 1136 (6th Cir. 1987).

       The Michigan Court of Appeals denied relief on this claim, finding that Petitioner

voluntarily confessed.  The court explained:

> Idolthus was arrested at approximately 5:00 p.m. on the afternoon of
> August 23, 2004. He then made two separate statements to the police –
> one at about 9:30 p.m. that evening, and the other at about 1:15 a.m. the
> following morning.  In concluding that Idolthus voluntarily waived his Fifth
> Amendment rights before each statement, the trial court analyzed the
> relevant factors and the evidence that it found most credible.  The facts
> found by the trial court have support in the record, and the record does
> not compel a conclusion that the two statements were anything other
> than voluntary.
>
> Idolthus argues that the elapsed time between his arrest and his
> statements supports a finding that the statements were involuntary.  He
> also contends that the trial court should have found the second statement
> involuntary because, at the time of the second statement, "[t]he attitude of
> the police when confronting Idolthus with Alton's allegation was patently
> accusatory," and he was therefore "operating at a heightened level of
> confusion."  These arguments are unavailing.  The elapsed time between
> Idolthus's arrest and his second statement was at most nine hours.

17

Although such a time period cannot be considered brief, it simply does not constitute the type of prolonged and extended custody that might render a statement involuntary. Regarding the assertion that Idolthus was "operating at a heightened level of confusion" during his second interview because the police had confronted him with his brother's statement, we note that police interviews are frequently confrontational and accusatory. However, the police witnesses at the *Walker* hearing specifically testified that they did not threaten or injure Idolthus, that they made no promises to him, and that they did not deprive him of any essential needs while in their custody. The mere fact that a suspect may have become "confus[ed]" when the police confronted him with potentially inculpatory evidence does not compel the conclusion that any subsequent statement was necessarily involuntary.

As noted above, we give deference to the trial court's assessment of witness demeanor and credibility at a *Walker* hearing. *People v. Kimble,* [651 N.W.2d 798, 801 (Mich. Ct. App. 2002)]. After assessing the witnesses' credibility, the trial court properly weighed the relevant factors and determined that both of Idolthus's statements were freely given after voluntary waivers. *People v. Tierney,* [703 N.W.2d 204, 219-220 (Mich. Ct. App. 2005)]. The trial court did not clearly err in reaching this determination.

*Hubbard*, 2007 WL 601603 at *10-11 (alteration in original).

The Michigan Court of Appeals' determination is neither contrary to Supreme Court precedent nor an unreasonable application of the law or the facts. The record indicates that Petitioner was advised of his constitutional rights, waived those rights, and spoke to the police. Under the totality of the circumstances, the conduct of the law enforcement officials cannot be said to have rendered Petitioner's statement involuntary. *See Mincey v. Arizona*, 437 U.S. 385, 401 (1978) (holding that determining whether a statement is voluntary "requires careful evaluation of all the circumstances of the interrogation").

Petitioner first alleges that his confession was coerced due to police activity. He argues that the duration of the interrogation was inherently coercive. Although

18

Petitioner was in custody a total of nine hours at the time of his statements, he was only interviewed twice during that period, in noncontinuous interrogations. Such circumstances are not inherently coercive. *See, e.g., Jackson v. McKee*, 525 F.3d 430, 434 (6th Cir. 2008) (ruling that 17-year-old's confession was voluntary when he was subject to noncontinuous interrogation while in custody for 40 hours but not harmed or deprived of any necessity). Moreover, there is no evidence that Petitioner was denied food, water, medical attention, or any other necessity while in police custody. *Cf. Greenwald v. Wisconsin*, 390 U.S. 519, 520-21 (1968) (holding that a confession was involuntary where officers questioned the defendant for more than 18 hours while depriving him of food, sleep, and medication).

Petitioner further argues that the interrogator's "accusatory tone" and Petitioner's confusion, resulting from the discovery of his brother's inculpatory statement, are indicative of coercion. However, an involuntary confession "wrings a confession out of an accused against his will." *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960). "[I]f his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Culombe*, 367 U.S. at 60 (citing *Rogers v. Richmond*, 365 U.S. 534 (1961)). The Sixth Circuit has established three requirements necessary to find that a confession was involuntary due to police coercion: "(I) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Johnson*, 351 F.3d 254, 261 (2003) (citations omitted).

19

Applying this standard in *United States v. Sylvester*, No. 06-1760, 2009 WL 1457650 (6th Cir. May 27, 2009), the Sixth Circuit upheld the admission of a confession which the petitioner alleged was the result of coercion because he "'felt threatened' by the agents" because he felt "a lot of 'tension' in the room when the officers spoke to him with 'intensity.'" *Id.* at *3. Similarly, the police use of an "accusatory tone" during the interrogation in this case does not meet the requirements of coercive police conduct to render Petitioner's confession invalid. Additionally, the police use of Alton's confession during the interrogation, which allegedly caused Petitioner to become confused, does not rise to the level of coercive police activity. *Cf. United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990) (defendant's statements were voluntary, notwithstanding the fact that the detective lied to the defendant about her co-defendant's statement, leaned over and hit his fist on the table, and accused the defendant of lying).

Petitioner also asserts that his learning disability rendered his confession involuntary. As discussed *supra*, however, Petitioner was competent to validly waive his *Miranda* rights despite his limitations. Petitioner was advised of his *Miranda* rights and affirmed that he understood those rights and wanted to speak with the police. There is no indication that, after being informed of his rights verbally and in writing, Petitioner was unable to understand his rights and voluntarily speak to police. Moreover, Petitioner's learning disability alone did not render to police interrogation coercive. *See, e.g., Murphy v. Ohio*, 551 F.3d 485, (6th Cir. 2009) (finding that the petitioner's "low intelligence alone did not make the officer's actions in questioning him

20

coercive.").  Petitioner has failed to establish that his learning disability rendered his confession unknowing or involuntary.

Petitioner also argues that his youth and limited education rendered his confession involuntary.  The Court disagrees.  Petitioner was 19 years old at the time of his arrest and was only three credits shy of completing his high school education. (Pet'r's. Pet. D-1.)  The record thus indicates that Petitioner possessed sufficient age and intelligence to understand his rights and speak to police of his own accord.  *See Garner v. Mitchell*, 557 F.3d 257 (6th Cir. 2009) (holding that a defendant who was 19 years old and had a troubled upbringing, poor education, and low IQ voluntarily confessed).  Petitioner's confession was valid and properly admitted at trial.  Habeas relief is not warranted on this claim.

### D.  Ineffective Assistance of Counsel Claims

Petitioner argues that trial counsel was ineffective for failing to verbally discuss Petitioner's learning disabilities during the *Walker* hearing although counsel had knowledge and documentation of the disability, for failing to sufficiently impeach Police Officer Williams, and for failing to seek admission of co-defendant Alton's confession as substantive evidence.  Respondent argues that these allegations do not amount to a claim of ineffective assistance of counsel because first, the record does not establish that Petitioner's learning disability affected his waiver, second, that counsel's cross-examination was a matter of strategy and sound trial tactics, and finally, that Alton's confession could not have been admitted as evidence even if counsel had so moved.

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v.*

21

*Washington*, 466 U.S. 668, 687 (1984).  To establish a claim for ineffective assistance

of counsel, petitioner must show that:  (1) counsel's errors were so serious that

"counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id.* at

687.  With respect to the performance prong of the *Strickland* test, a strong

presumption exists that counsel's behavior lies within the wide range of reasonable

professional assistance.  *Id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir.

1994).  "[Petitioner] must overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at

689 (citation omitted).  "[T]he court should recognize that counsel is strongly presumed

to have rendered adequate assistance and made all significant decisions in the

exercise of reasonable professional judgment."  *Id.* at 690.  Regarding the prejudice

prong of the *Strickland* test, the ultimate inquiry is "whether there is a reasonable

probability that, absent [counsel's] errors, the factfinder would have had a reasonable

doubt respecting guilt."  *Id.* at 695.

Petitioner's first claim, that counsel was ineffective for failing to introduce

evidence of Petitioner's learning disability at the *Walker* hearing, is without merit.  The

Michigan Court of Appeals denied relief on this claim finding that Petitioner failed to

offer any specific evidence in support of his claim.  The court further noted that

Petitioner admitted that he could read, that he signed his police statements, and that a

school report indicated that reading comprehension was one of his strengths.

*Hubbard*, 2007 WL 601603 at *12-13.  This decision is neither contrary to Supreme

Court precedent nor an unreasonable application thereof.  Petitioner has failed to

establish that his limited education or learning disability affected his ability to knowingly and voluntarily waive his *Miranda* rights and give his police statement.  Consequently, any failure on the part of trial counsel to discuss this matter at the *Walker* hearing does not fall outside of the wide range of reasonable professional judgment.  More importantly, since Petitioner's learning disability did not render his confession inadmissable, counsel's failure to verbally mention the issue at the *Walker* hearing did not prejudice Petitioner.  Petitioner has failed to establish that counsel was ineffective under *Strickland*.

Petitioner's second claim, that counsel was ineffective for failing to impeach Officer Williams at trial with his prior testimony at the *Walker* hearing, is also without merit.  The Michigan Court of Appeals denied relief on this claim, recognizing that the court "will not substitute [its] judgment for that of counsel regarding matters of trial strategy[,]" and finding that "trial counsel's failure to impeach Williams with respect to this minor detail of his testimony actually prejudiced [Petitioner] in any way."   *Hubbard*, 2007 WL 601603 at *13.

The court agrees with the Michigan Court of Appeals that impeachment is part of trial counsel's trial strategy, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 490.  Furthermore, even if this court were to acknowledge Petitioner's challenge of this particular trial decision, the claim would still be without merit. Petitioner's contention is that Officer Williams should have been impeached "with his evidentiary hearing testimony that the form made no indication that he gave [Petitioner] an opportunity to review the second statement that [Petitioner] made."  (Petr's Pet. 37.)

23

But Officer Williams did not contradict himself.  At the *Walker* hearing, Officer Williams testified that "[he] did not ask [Petitioner] on the second statement whether [Petitioner] had a chance to review the form[.]" (*Walker* Hrg. Tr. 44.)  Officer Williams had earlier testified that "[Petitioner] had a chance to review [the statement,]" and that "[Officer Williams] gave [Petitioner] the opportunity to review it after it was completed, and [Officer Williams] was sure [he and Petitioner] went through it as [he] wrote it."  *Id.* at 43.  In saying that the form made no indication that Petitioner reviewed the statement, Officer Williams did not contradict his prior testimony that Petitioner did in fact have the chance to review the statement. Officer Williams could not have been impeached on this issue.  Petitioner has thus failed to establish that counsel was ineffective in this regard.

Lastly, Petitioner's third claim, that counsel was ineffective for failing to have Alton's confession admitted as substantive evidence or given to his jury for deliberation, is likewise without merit.  The Michigan Court of Appeals denied relief on this claim, finding that defense counsel was not ineffective for failing to make a meritless objection or futile argument because Alton's confession was not substantively admissible, and the jury could not take the confession into the deliberation room.  *See Hubbard*, 2007 WL 601603 at *12 (citations omitted).  This decision is neither contrary to *Strickland* nor an unreasonable application thereof, since refraining from making a meritless objection is a reasonable, acceptable and appropriate trial decision.  *See McQueen v. Scroggy*, 99 F.3d 1302, 1328 (6th Cir. 1996) (counsel is not ineffective for failing to make a futile claim).  Petitioner has not shown that counsel erred or that he was prejudiced by counsel's conduct.

24

Accordingly, given the court's determination that the underlying claims lack

merit, Petitioner cannot establish that defense counsel erred or that he was prejudiced

by counsel's conduct as to such matters so as to satisfy the *Strickland* standard.

Habeas relief is not warranted.

### E.  Insufficient Evidence Claim

Petitioner also asserts that he is entitled to habeas relief because the

prosecution presented insufficient evidence to support his first-degree murder

convictions.  Petitioner claims that there was insufficient evidence that he shot Annie

Rivers, chiefly noting Constance Davenport's testimony that Petitioner was present

during the robbery but that she did not see Petitioner shoot anyone.  Petitioner further

claims that there was insufficient evidence to convict him of aiding and abetting his

brother in the murders of Frank Olson and Jerome Edmonds.

In *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the United States Supreme

Court established that a federal court's review of a sufficiency of the evidence claim

must focus on whether "after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt."  *Id.* at 319 (emphasis in original); *see also DeLisle

v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998).  The court must view this standard

through the framework of 28 U.S.C. § 2254(d).  *See Martin v. Mitchell*, 280 F.3d 594,

617 (6th Cir. 2002).  The *Jackson* standard must be applied "with explicit reference to

the substantive elements of the criminal offense as defined by state law."  *Jackson*,

443 U.S. at 324 n. 16.  "The mere existence of sufficient evidence to convict therefore

defeats a petitioner's claim." *Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003) (citation omitted).

Under Michigan law, in order to convict a defendant of first-degree murder, "the prosecution must prove that the defendant intentionally killed the victim and that the killing was premeditated and deliberate." *People v. Marsack*, 586 N.W.2d 234, 237 (Mich. Ct. App. 1998). "Premeditation and deliberation require sufficient time to allow the defendant to take a second look." *Id.* (citing *People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995)). The elements of aiding and abetting are:

> (1) that the crime charged was committed either by the defendant or by some other person, (2) that the defendant performed acts or gave encouragement which aided and assisted in the commission of the crime, and (3) that the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time of giving the aid or encouragement.

*People v. Anderson*, 421 N.W.2d 200, 210 (Mich. Ct. App. 1988) (citing *People v. Acosta*, 396 N.W.2d 463, 467 (Mich. Ct. App. 1986)).

The Michigan Court of Appeals rejected Petitioner's challenge to the sufficiency of the evidence regarding the first-degree murder of Annie Rivers:

> In his second statement, Idolthus confessed that he had shot Rivers, and that Alton had shot Edmonds and Olson. Therefore, contrary to Idolthus's assertion on appeal, there was evidence that he personally killed at least one of the victims. Frequently, "'when the defendant confesses, there can be little doubt concerning his guilt.'" "Indeed, 'the defendant's *own* confession is probably the most probative and damaging evidence that can be admitted against him.'" Furthermore, although Alton's statement to the police was not substantively admitted into evidence before Idolthus's jury, the jurors heard testimony about it when Alton was cross-examined before them. Finally, Idolthus's jury heard Officer Williams testify that Idolthus's second statement was consistent with Alton's statement. Therefore, Idolthus's jury had other, independent bases on which to conclude that Idolthus had personally shot and killed Rivers.

26

Idolthus's jury heard Idolthus testify himself, and also heard testimony regarding Idolthus's first custodial statement to the police. Idolthus indicated in his first statement to the police that he had been present at 4139 Canton Street during the shootings, that he had possessed a .38-caliber revolver that was identical to the one possessed by Alton, but that he shot no one. Similarly, Idolthus testified at trial that although he had been present during the shootings, he had never entered the kitchen, and had never shot anyone. Indeed, Idolthus testified that Alton shot all three victims.

However, Idolthus's jury also heard testimony concerning Idolthus's second custodial statement to the police. In contrast to his trial testimony and first custodial statement, Idolthus indicated in his second confession that he not been completely truthful in his first statement, and that he had in fact shot the "lady" in "the kitchen."

Idolthus's jury had a special opportunity to view Idolthus's demeanor in the courtroom and to assess his credibility on the witness stand.  We must defer to that special opportunity.  Although Idolthus testified at trial that he was never in the kitchen and did not kill anyone at 4139 Canton Street, his second statement to the police indicated that he was indeed in the kitchen, that he shot Rivers there, and that he possessed a handgun at that time that was identical to the type used to kill Rivers . . .

The medical examiner testified that Rivers sustained three gunshot wounds – one to the right wrist, one to the right arm, and one to the shoulder and chest.  The medical examiner testified that the gunshot wounds to the wrist and arm would not have been fatal, but the wound to the shoulder and chest caused Rivers's death.  He testified that, based on the type and trajectory of the wounds themselves, Rivers was likely in a seated position when she was shot and killed.  Rivers was a small and short woman aged in her sixties.  No weapons were found on or near Rivers's body.

Idolthus shot Rivers three times with a handgun while she was seated in the kitchen.  We conclude that this evidence was sufficient to allow a rational jury to find that Idolthus possessed the requisite intent to kill.  We also conclude that there was sufficient evidence of premeditation and deliberation in this matter.  The fact that Idolthus inflicted two nonfatal gunshot wounds before shooting Rivers a third time in the shoulder and chest indicates that he had sufficient time to take a second look. Moreover, although the use of a lethal weapon is not alone adequate to show premeditation, the killing of an unarmed victim "is sufficient when

27

> coupled with the use of a firearm to establish beyond a reasonable doubt
> a premeditated intention to kill."

*Hubbard*, 2007 WL 601603 at *14-15 (internal citations omitted).

Petitioner's insufficient evidence claim essentially challenges the jury's credibility determinations and the inferences that the jury, acting as the fact-finder, drew from the evidence presented at trial. It is well settled, however, that "[a] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983). Given the evidence presented at trial, particularly Petitioner's own confession, and given that "a defendant's confession is probably the most probative and damaging evidence that can be admitted" against him, *Fulminante*, 499 U.S. at 292 (internal quotation marks omitted), the Michigan Court of Appeals' decision was reasonable. The prosecution presented sufficient evidence to support the jury's verdict that Petitioner committed the first-degree murder of Annie Rivers. Habeas relief is not warranted on this claim.

Petitioner is also not entitled to habeas relief on his claim that the prosecution presented insufficient evidence to convict him of aiding and abetting his co-defendant in the murders of Frank Olson and Jerome Edmonds. Applying the *Jackson* standard, the Michigan Court of Appeals determined that the prosecution presented sufficient evidence to support the convictions. The court stated:

> Idolthus's trial testimony, first statement to the police, and second
> statement to the police all tell slightly different stories. What is clear from

28

Idolthus's three accounts, however, is that Alton and Idolthus already had several guns in their possession just before the shootings, that the brothers agreed for some reason to go together to the house where Idolthus dealt crack, and that the brothers cooperated in retrieving yet another gun from the upstairs bedroom upon their arrival at 4139 Canton Street. Although Idolthus suggested that he and Alton never discussed robbing 4139 Canton Street prior to the shootings, he insisted at trial that robbery must have been Alton's motive for the killings.

An aider and abettor's state of mind may be inferred from the facts and circumstances, such as a close association between the defendant and the principal, and the defendant's participation in the planning or execution of the crime . . .

Idolthus personally testified at trial that Alton killed Olson and Edmonds. He also testified that he assisted Alton in obtaining the shotgun that was used to kill Edmonds. Finally, although Idolthus disclaimed any prior knowledge of a robbery plan, he – and not Alton – sold drugs out of 4139 Canton Street and was therefore familiar with the people who frequented the house and the location where money was kept. In light of Idolthus's testimony inculpating Alton, the lethal weapons possessed by Idolthus at the time of the incident, the fact that Idolthus directed Alton to the place of the killings for the purpose of obtaining an additional gun, Idolthus's familiarity with the house at 4139 Canton Street, and the close connection between Idolthus and Alton, a rational jury could have found beyond a reasonable doubt that (1) the underlying killings were committed by Alton, (2) Idolthus performed acts that assisted Alton in carrying out the shootings, and (3) Idolthus had knowledge that Alton intended the crimes at the time he gave assistance.

*Hubbard,* 2007 WL 601603 at *16-17 (internal citations omitted).

This court agrees that a rational trier of fact could have found that the prosecution proved, beyond a reasonable doubt, that Petitioner aided and abetted his brother in committing two first-degree murders. The trial testimony, including Petitioner's own police statements, establishes that Petitioner assisted his brother in committing the shootings and acted with sufficient intent and knowledge. The state

29

court's decision is neither contrary to nor an unreasonable application of federal law or the facts.  Petitioner is therefore not entitled to habeas relief on this claim.

### F.  Photographic Evidence Claim

Lastly, Petitioner asserts that he is entitled to habeas relief because the trial court erred in admitting a photograph of victim Annie River's broken arm after a shotgun blast.  Petitioner argues the photograph was irrelevant and unfairly prejudicial.  Respondent contends that this claim lacks merit and does not warrant relief.

It is well-established that alleged trial court errors in the application of state procedure or evidentiary law, particularly regarding the admissibility of evidence, are generally not cognizable as grounds for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993); *see also Olsen v. McFaul*, 843 F.2d 918, 933 (6th Cir. 1988) (such claims are almost always rejected as grounds for granting a writ of habeas corpus).  Instead, questions concerning the admissibility of evidence, as well as its probative or prejudicial value, are properly left to the sound discretion of the trial court.  *Oliphant v. Koehler*, 594 F.2d 547, 555 (6th Cir. 1979).  Only where the admission of the disputed evidence rendered the trial "so fundamentally unfair as to constitute a denial of federal rights" may such a claim provide grounds for granting a writ of habeas corpus.  *Clemmons v. Sowders*, 34 F.3d 352, 356 (6th Cir. 1994).

The Michigan Court of Appeals considered Petitioner's claim as a matter of state evidentiary law and concluded that no abuse of discretion occurred, noting that the

photograph was relevant because it reflected that Annie Rivers's murder was both premeditated and deliberate and that Petitioner had the opportunity to take a second look after inflicting the initial non-fatal gunshot wounds. *Hubbard*, 2007 WL 601603 at *18. The court further found that the photograph did not unfairly prejudice Petitioner because the photograph was "not overly gruesome and contain[ed] very little blood or other detail. Any possible prejudice to [Petitioner] did not substantially outweigh the probative value of the evidence." *Id.* (citing Mich. R. Evid. 403).

This court agrees with the Michigan Court of Appeals that the trial court did not err in admitting the photograph of the victim, as the photograph was relevant to Petitioner's intent, and had more probative value than prejudicial effect. *See United States v. Guthrie*, 557 F.3d 243 (6th Cir. 2009). Furthermore, the Sixth Circuit has held that a challenge to the admission of a gruesome photograph does not present a question of constitutional magnitude. *See Cooey v. Coyle*, 289 F.3d 882, 893-94 (6th Cir. 2002) (citing *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997) (holding that such photographs do not raise the "spectre of fundamental fairness such as to violate federal due process of law")). The court thus concludes that the admission of the victim's photograph did not so infect the entire trial or prejudice Petitioner so as to constitute a violation of due process. Habeas relief is not warranted on this claim.

### G. Certificate of Appealability

A petitioner must receive a certificate of appealability ("COA") in order to appeal the denial of a habeas petition for relief from either a state or federal conviction. 28 U.S.C. §§ 2253(c)(1)(A), (B). A district court, in its discretion, may decide whether to

issue a COA at the time the court rules on a petition for a writ of habeas corpus or may wait until a notice of appeal is filed to make such a determination.  *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002); *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1072 (6th Cir. 1997), *overruled in part on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997).  In denying the habeas petition, the court has studied the case record and the relevant law, and concludes that, as a result, it is presently in the best position to decide whether to issue a COA.  *See Castro*, 310 F.3d at 901 (quoting *Lyons*, 105 F.3d at 1072 ("[Because] 'a district judge who has just denied a habeas petition . . . will have an intimate knowledge of both the record and the relevant law,'" the district judge is, at that point, often best able to determine whether to issue the COA.)).

A court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A petitioner must "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In this case, the court concludes that reasonable jurists would not debate the court's conclusion that Petitioner does not present any claims upon which habeas relief may be granted.  Therefore, the court will decline to issue a certificate of appealability.

## IV.  CONCLUSION

For the reasons stated, the court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition.

Accordingly, IT IS ORDERED that the petition for a writ of habeas corpus [Dkt. # 1] is DENIED.

IT IS FURTHER ORDERED that the court DECLINES to issue a certificate of appealability.

 S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 8, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 8, 2009, by electronic and/or ordinary mail.

 S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522-